## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Aminah Abdul-Hakim,**

**Plaintiff,**

**v.**                                                    **Case No. 05-2454-JWL**

**The Goodyear Tire & Rubber Co.,**

**Defendant.**

### MEMORANDUM & ORDER

Plaintiff Aminah Abdul-Hakim worked for defendant The Goodyear Tire & Rubber Company from February 10, 2003 through July 3, 2003, when her employment was terminated. Thereafter, plaintiff filed suit against defendant alleging that she was subjected to sexual harassment throughout the duration of her employment and that defendant terminated plaintiff's employment on the basis of her gender and/or in retaliation for plaintiff's complaints of sexual harassment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 40). As will be explained, the motion is denied in its entirety.

I.      **Facts**

The following facts are uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff, an African-American female, began working for defendant as an area manager on February 10, 2003. Plaintiff was assigned to the "light truck" area of defendant's plant, where she supervised the production of tires on first- and second-stage tire

machines.  First-stage tire machines build tire carcasses and second-stage tire machines place the carcasses on a drum and apply belts and tread to the tires.  The tires are then moved to another department for curing.  Plaintiff was the only female area manager in the light truck area and she supervised 22 employees.  As an area manager, plaintiff's job duties included ensuring that a certain number of tires were built per shift and managing the employees who worked in the department.  For the duration of her employment, plaintiff's direct supervisor was Brad Shunk.  Billy Taylor was the business center manager at the plant and Dannette Jackson was the employment manager at the plant.

Plaintiff contends that she was subjected to unlawful sexual harassment from the beginning of her employment.  Plaintiff testified that she was the target of several sex-based comments during the course of her employment.  During her training, for example, plaintiff heard another manager tell others to "get a good look now [at plaintiff] because this is the only day you'll be able to enjoy this."  On another occasion, one of plaintiff's coworkers, Dave Young, another area manager, asked plaintiff what it would take to sleep with her.  Still another time, Mr. Young twirled a cherry stem in his mouth and said to plaintiff, "I bet that makes you wonder what I can do."  Plaintiff reported these comments to Mr. Taylor,[1] who  simply told her

---

[1]Defendant's "zero tolerance" sexual harassment policy permits an aggrieved employee to discuss concerns with a department manager, a personnel representative or an EEO representative.  The policy also provides a toll-free number for the purpose of making an anonymous phone call.  Plaintiff was aware of the policy and, according to her, she preferred to make complaints directly to management (rather than using the toll-free number), including Mr. Taylor and Ms. Jackson, so that problems in the workplace could be addressed directly.

to keep the employees in line and that they needed to be corrected.  Upon entering the lunch room one day, plaintiff heard a male employee say "women shouldn't be in here."  Another day, Justin Adams, a manager in the curing department, told plaintiff "I bet you're a fire cracker in the sack."

In addition to these comments directed at plaintiff, plaintiff's harassment claim is based on inappropriate touchings that plaintiff allegedly experienced.  Plaintiff testified that on numerous occasions, male non-supervisory employees bumped into plaintiff while walking past her on the production floor.  According to plaintiff, these "bumps" consisted of an employee walking past her from behind "with their body against" her.  Plaintiff testified that the employees kept walking at all times (in other words, the employees did not stop or pause to linger against her) and that these touchings occurred during "crowded" situations and lasted for "one second, really quick."  Plaintiff reported to Mr. Taylor and Ms. Jackson that employees were "bumping into [her] a bit."  In addition, plaintiff claims that another area manager, Mike Tomei, bumped into plaintiff on several occasions and that she believes he did so intentionally.  On these occasions, Mr. Tomei would walk past plaintiff from behind with his "whole body . . . pressed up against" her.  On another occasion, Johnny Walker, another area manager, reached across and touched plaintiff's breasts while she was working at a computer and, while doing so, stated "We're all comfortable with our bodies, aren't we?"  Mr. Walker's direct supervisor was present at the time and did not address the incident.

Plaintiff also complains about sex-based comments that she overheard and that, while not directed at plaintiff, affected her work environment.  On one occasion, Mr. Young stated over

a work radio that "women should be seen and not heard." Plaintiff reported this comment to Mr.

Taylor, who either did not respond or, as he had done on at least one other occasion, responded

only with the statement that "pretty women should smile more."[2]  Yet another time, plaintiff

overheard Mr. Young talking to Mr. Walker. Mr. Walker told Mr. Young, "I just got me some,"

to which Mr. Young responded, "You just got you some pussy? Let me smell your fingers." On

at least three or four different occasions, plaintiff heard male managers call each other "pussy."

Mr. Taylor overheard the remark on one occasion and told plaintiff to "keep them in line." On

another occasion when plaintiff voiced her objection to the remark, one of the male managers

asked her, "well, you're one of the guys, aren't you?"

Finally, plaintiff complains about written sex-based comments that she observed in the

workplace.  In April or May 2003, plaintiff saw a note near a standing desk in the light truck

department which said "Rick likes to fuck people."  Plaintiff understood the note to mean that

Rick Rivera, a coworker, liked to mistreat people and not that he liked to have sexual intercourse

with people.  Mr. Rivera dismissed the note and threw it away.  Plaintiff told Mr. Rivera that he

should complain about the note.  In the same time frame, plaintiff saw a message scratched on

a cabinet door that said "Rick likes nuts" or "suck nuts."  Plaintiff reported this writing to Mr.

Shunk and Mr. Taylor but the writing was not removed.  In addition, during plaintiff's initial job

training, plaintiff noticed that the sign on the door to one of the women's restrooms in the

---

[2]Plaintiff testified that Mr. Taylor made this response on two occasions when she complained about the work environment.  It is unclear from the record, however, which specific complaints raised by plaintiff drew this response from Mr. Taylor.

training area said "WEMEN" instead of "WOMEN."   Plaintiff complained to training coordinator Jack Burgess about the sign, who initially told plaintiff that defendant had tried to remove the sign on an earlier occasion and could not do so.  Nonetheless, by the time plaintiff returned from lunch on the day of her complaint, the sign had been removed.  Plaintiff testified that she was "kind of offended" by the sign but she did not know "if they misspelled it or what else."  Plaintiff also complained to Mr. Burgess and Dannette Jackson during her training that she observed graffiti in the stalls of the women's restrooms.  According to plaintiff, the graffiti typically consisted of phrases such as "Mary's a slut" and the graffiti did not mention plaintiff at any time and was not directed at plaintiff in any way.  The graffiti was also fairly limited in scope; not every stall contained graffiti and those that did typically contained only "two or three blurbs."  Mr. Burgess told plaintiff that he would tell the janitors to remove the graffiti and it is undisputed that the graffiti  was removed.  Whenever new graffiti appeared, plaintiff asked the janitors to clean it up and the janitors always did so.

In addition to her claim for sexual harassment, plaintiff claims that she was discharged in July 2003 based on her gender or in retaliation for her complaints about the work environment.  The pertinent facts surrounding the termination of plaintiff's employment are as follows.  Area managers, like plaintiff, were required to cover shifts for each other when one area manager took a vacation.  In late June 2003, Mr. Tomei took a two-week vacation.  During the first week, the other area managers, including plaintiff, covered Mr. Tomei's shifts.  While the record is not entirely clear, it appears that the area managers could not agree among each other who would cover which shifts for the second week of Mr. Tomei's vacation (a week that

included the 4th of July holiday weekend).  As a result, Mr. Young simply scheduled various area managers to work certain shifts in Mr. Tomei's absence.  Although the schedule was posted on June 26, 2003, plaintiff did not see the schedule until Sunday, June 29, 2003 and it indicated that plaintiff was scheduled to work on Monday, July 1, 2003 and Tuesday, July 2, 2003. Plaintiff, who had previously advised management that she needed advanced notice of her schedule in order to make child care arrangements for her son, advised her supervisor, Mr. Shunk, that she could not work on July 1 or July 2.  When Mr. Shunk told her that she was required to report to work on those two days, plaintiff stated that she wanted to discuss the situation with Mr. Taylor and someone in human resources.  Mr. Shunk invited her to do so. Plaintiff then approached Mr. Taylor about the schedule and advised him that she was unable to work on July 1 or July 2.  According to plaintiff, Mr. Taylor told her that he would find someone else to cover the shifts and that he would simply call plaintiff at home if he needed her to report to work.  According to Mr. Taylor, he advised plaintiff that she was required to report to work on those two days and that there would be consequences if she failed to report to work as scheduled.

Plaintiff did not report to work on July 1 or July 2 and she testified that she stayed home on July 1 waiting for Mr. Taylor to call her and attempting to make child care arrangements in the event that he did call her to report to work.  According to plaintiff, she spoke with her son's paternal grandmother to put her on notice that plaintiff may have to report to work and, if so, would need the grandmother to care for plaintiff's child, but she did not secure definitive arrangements due to the uncertainty of whether plaintiff was, in fact, going to have to report to

6

work.  Plaintiff testified that she did not report to work because Mr. Taylor never called her to advise her that she needed to report to work.

When she returned to work on July 3, 2003, Mr. Taylor told her that he was terminating her employment for insubordination due to her refusal to work as scheduled.  Mr. Taylor submitted his termination decision to a review board pursuant to company policy and the review board affirmed that decision.  According to plaintiff, Mr. Taylor, in May 2003, had encouraged plaintiff to quit her job, suggesting that she would be happier at home raising her child.  Specifically, plaintiff testified that Mr. Taylor stated, "Why don't you just quit?  This isn't a place you'd probably want to be at anyhow.  This is a horrible job, and it's unfair and . . . you probably want to be at home with your son anyhow."  According to plaintiff, Mr. Taylor also remarked during this conversation that "Mothers probably want to be at home with their children, you know, you probably don't want to be here, you know, you want to be with your child being a mom."

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."

7

*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.  *Id.* (citing Fed. R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.    Plaintiff's Sexual Harassment Claim

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  This statutory provision prohibits subjecting an employee to a hostile work environment. *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262 (10th Cir. 2005) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65  (1986)). To establish that a sexually hostile work environment existed, plaintiff must prove the following elements: (1) she is a member of a  protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of plaintiff's employment and created an abusive working environment. *Id.* at 1262-63 (quotations and alterations omitted).  In addition, plaintiff must establish that defendant is liable for the alleged sexually hostile work environment. *See Hollins v. Delta Airlines*, 238 F.3d 1255, 1257-58 (10th Cir. 2001).

In its motion for summary judgment, defendant asserts that plaintiff cannot establish the "severe and pervasive" prong of her hostile work environment claim and that, in any event, defendant, as a matter of law, cannot be held liable for the alleged sexually hostile work environment.  The court addresses these two arguments in turn.

### A.    *Severe and Pervasive Conduct*

For a sexual harassment claim to survive summary judgment, "a plaintiff must show that

a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (quoting *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998)).  The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective; that is, "the environment must be both subjectively and objectively hostile or abusive. *Id.* (citing *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 23 (1993)).[3]  To evaluate whether a working environment is objectively hostile or abusive, the court examines all the circumstances, including "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23).

After carefully considering plaintiff's evidence concerning the alleged conduct, the totality of the circumstances, and the applicable standard for analyzing a hostile work environment claim, the court concludes that plaintiff has set forth sufficient facts to survive summary judgment on this claim.  Although defendant characterizes the conduct about which plaintiff complains as "nothing more than sporadic and tasteless banter on the job in a predominantly male production facility," (an argument that defendant is free to make at trial),

---

[3]For purposes of its motion, defendant does not dispute that plaintiff subjectively perceived the conduct at issue as pervasive and severe harassment based on plaintiff's sex.

a rational fact finder could certainly consider evidence of comments demonstrating a particular animus toward women in the workplace (*e.g.*, "women should be seen and not heard"; "women shouldn't be in here") as well as evidence of sex-based comments made directly to plaintiff and evidence of unwanted physical contact to arrive at a different conclusion.[4]   Even if one considered the number of specific incidents challenged by plaintiff as not that many, the short duration of plaintiff's employment (less than five months) may be sufficient to render "pervasive" in the eyes of a reasonably jury conduct that might otherwise be considered "sporadic."   Moreover, while some of the conduct about which plaintiff complains was not directed at plaintiff in any respect, such as the writings about Rick Rivera, the handful of occasions on which male managers called each other "pussy," and the vulgar conversation she overheard between Mr. Young and Mr. Walker, the sex-based comments made directly to plaintiff and the comments tending to suggest an animus toward women in the workplace cannot be brushed aside so easily in light of the short duration of plaintiff's employment and the fact that the work environment was, as defendant points out, dominated by males.[5]   Finally, while

---

[4]Defendant asserts that the court cannot consider as part of plaintiff's sexual harassment claim any allegations of physical contact because plaintiff failed to include such allegations in her charge of discrimination. The court rejects this argument.  Defendant does not direct the court to any cases supporting its argument and the court's own research has not uncovered any cases suggesting that a plaintiff may not generally allege "sexual harassment" in her charge (as plaintiff has done here, in addition to complaining specifically about gender-based comments and unwelcome sexual comments) but must identify specific categories of harassment she allegedly experienced.

[5]Highlighting evidence from defendant's witnesses suggesting that some of the conduct about which plaintiff complains would constitute a violation of defendant's "zero tolerance" policy, plaintiff suggests that such conduct, as a result, more likely than not constitutes a violation of Title VII.  The court disagrees.  Even assuming some of the conduct

plaintiff's evidence concerning unwanted physical contact in the workplace might not, standing alone, be sufficient to state a claim for sexual harassment, those contacts may become material when viewed in the broader context of plaintiff's work environment.

In short, the court concludes that plaintiff's evidence in this case is sufficient to require a trial on plaintiff's sexual harassment claim. Summary judgment is denied.

B.     *Employer Liability*

Defendant also moves for summary judgment on plaintiff's sexual harassment claim on the grounds that, even assuming she is able to show sufficiently severe and pervasive conduct, defendant cannot be held liable for that conduct in light of the affirmative defense outlined by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)). In other words, defendant maintains that summary judgment is warranted against plaintiff because the harassment did not culminate in a tangible employment action against her; defendant exercised reasonable care to prevent and correct promptly any sexual harassment in the workplace; and plaintiff unreasonably failed to take advantage of corrective opportunities provided to her by defendant.  *See McInnis v.*

---

challenged by plaintiff would violate defendant's policy, that conduct would not necessarily be actionable under Title VII. *See, e.g., Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1346 (7th Cir.1995) (even though employee's conduct was not sufficiently severe or pervasive to constitute harassment under Title VII, his conduct nonetheless violated more stringent company harassment policy).

*Fairfield Communities, Inc*., 458 F.3d 1129, 1139 (10th Cir. 2006); *Ellerth*, 524 U.S. at 765.

Defendant's motion is denied on this issue for several reasons.  First, defendant has not addressed in any respect the issue of whether the alleged perpetrators in this case had supervisory authority over plaintiff such that the *Faragher/Ellerth* defense would be relevant. It appears to the court that most, if not all, of the individuals who allegedly harassed plaintiff were plaintiff's coworkers (and, like plaintiff, were managers) and did not exercise any authority over plaintiff.  *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000) (*Faragher* defense may be raised if no tangible employment action is taken and hostile work environment is created by supervisor with immediate or successively higher authority over plaintiff).  Assuming that each of the perpetrators had the same status as plaintiff, then the *Faragher/Ellerth* defense is not relevant. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 n.6 (2004) ("*Ellerth* and *Faragher* expressed no view on the employer liability standard for co-worker harassment."); *see also Curran v. AMI Fireplace Co.*, 2006 WL 137405, at *7 (10th Cir. Jan. 19, 2006) (*Faragher/Ellerth* defense is applicable when supervisor commits sexual harassment against a subordinate).  Defendant's failure to address this issue (and its failure to respond to the issue once raised by plaintiff in plaintiff's response to the motion for summary judgment) renders the court unable to ascertain at this juncture whether the defense is applicable.

Moreover, assuming that the defense is applicable and further assuming that the harassment did not culminate in a tangible employment action against plaintiff,[6] at the very least

---

[6]While plaintiff obviously suffered a tangible employment action in that her employment was terminated, defendant urges that plaintiff's termination was not the culmination of any harassment on the part of Mr. Taylor, the decisionmaker.  Stated another

factual issues exist with respect to whether defendant exercised "reasonable care to prevent and correct promptly" the alleged sexual harassment and whether plaintiff "unreasonably failed to take advantage" of corrective opportunities.  Viewing the evidence in the light most favorable to plaintiff, plaintiff approached Mr. Taylor and Ms. Jackson on several occasions and complained about what she perceived to be inappropriate conduct of a sex-based nature in the workplace.[7]  Plaintiff's complaints were largely ignored and, on occasion, she was advised to correct the problem herself.  In such circumstances, defendant has not shown that it is entitled to summary judgment on its affirmative defense.  *See Mallinson-Montague*, 224 F.3d at 1228 (an employer is entitled to judgment as a matter of law under the *Faragher/Ellerth* affirmative defense "only if the evidence points but one way and is susceptible to no reasonable inferences supporting" the opposing party); *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3rd Cir. 2000) (defendant may prevail on its affirmative defense at the summary judgment stage only if it proves its affirmative defense "so clearly that no rational jury could find to the contrary.").

## IV.    Plaintiff's Discharge Claims

---

way, defendant contends that plaintiff's termination was wholly unrelated to any harassment in the workplace.  *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006) (a supervisor's tangible employment action must be related to the alleged discriminatory harassment to preclude recourse to the *Faragher/Ellerth* affirmative defense) (collecting cases).  The court declines to address this argument in light of its conclusion that defendant is not entitled to summary judgment on the affirmative defense in any event.

[7]In its reply, defendant seems to suggest that plaintiff's verbal complaints are irrelevant because she did not expressly complain about a "hostile work environment."  Title VII does not require a plaintiff to use the phrase "hostile work environment" in rendering a complaint about such conduct.

Plaintiff claims that defendant terminated her employment based on her gender and/or in retaliation for plaintiff's prior complaints of sexual harassment.  As plaintiff has no direct evidence of discrimination, both claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Antonio v. The Sygma Network, Inc.,* 458 F.3d 1177, 1181 (10th Cir. 2006).  Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of discrimination or retaliation. *See id.*  If she establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for taking the adverse employment decision.  *See id.*  If defendant offers a legitimate, nondiscriminatory reason for its action, summary judgment against plaintiff is warranted unless she shows that there is a genuine issue of fact as to whether defendant's reason is pretextual.  *See id.*; *Medina v. Income Support Div., State of New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005).

Defendant moves for summary judgment on both of plaintiff's discharge claims, contending first that plaintiff cannot establish a prima facie case of gender discrimination or retaliation.  Defendant also contends that plaintiff cannot show that defendant's asserted legitimate, nondiscriminatory reason for terminating plaintiff's employment is pretextual.  As explained more fully below, the court concludes that plaintiff has shown the existence of genuine issues of material fact with respect to her prima facie case of gender discrimination and retaliation and has also shown a genuine issue of material fact as to whether defendant's proffered reason for its action is pretextual.  The court, then, denies defendant's motion for summary judgment on these claims.

A.      *Plaintiff's Prima Facie Case of Discriminatory Discharge*

In support of its motion for summary judgment, defendant contends that plaintiff cannot establish the fourth prong of her prima facie case of discriminatory discharge–a prong that, according to defendant, requires plaintiff to show either that plaintiff's job was not eliminated after plaintiff's discharge or that similarly situated employees were treated more favorably than plaintiff.  The Tenth Circuit has, at times, articulated the fourth prong of the prima facie case in these terms.  *See Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1229 (10th Cir. 2000) (articulating as fourth prong of prima facie case a showing that the plaintiff's job was not eliminated after the plaintiff's discharge); *EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1195 n.6 (10th Cir. 2000) (evidence that plaintiff was treated differently than similarly situated employees is sufficient to establish the fourth prong of the prima facie case).  Defendant asserts that plaintiff has failed to come forward with admissible evidence that her job was not eliminated and has come forward with no evidence that similarly situated male employees were treated more favorably than plaintiff; thus, defendant maintains that summary judgment on this claim is required under Tenth Circuit precedent.

Assuming, without deciding, that defendant is correct in its assessment of plaintiff's evidentiary showing (that is, that plaintiff has not come forward with admissible evidence that her job was not eliminated and that she has not shown that any similarly situated male employees were treated more favorably), the court nonetheless concludes that plaintiff has shown the existence of genuine issues of material fact concerning the fourth prong of her prima facie case. In so concluding, the court relies primarily on the Tenth Circuit's decision in *Plotke v. White*,

16

405 F.3d 1092 (10th Cir. 2005).  In *Plotke*, the plaintiff filed suit alleging that her employer had fired her based on her gender; her employer, in turn, asserted that the plaintiff was discharged for unsatisfactory conduct, including failure to follow guidance issued by her supervisors and failure to follow established chains-of-command. *Id.* at 1093, 1097.  In resolving the defendant's motion for summary judgment, the district court required plaintiff to show, as the fourth element of her prima facie case of discriminatory discharge, that her job was not eliminated after her discharge. *Id.* at 1099.  Concluding that plaintiff had failed to establish this element, the district court granted summary judgment on the plaintiff's discriminatory discharge claim. *Id.*  The Tenth Circuit reversed the district court, expressly disagreeing with the district court's "fourth element analysis." *Id.*  While the Circuit recognized that it had held that "one way a plaintiff may establish a prima facie case is to include evidence that her job was not eliminated after her discharge," the Circuit also emphasized that such evidence was irrelevant "where the employer contends that the actual reason for termination in a discriminatory firing case is not elimination of the employee's position but, rather, unsatisfactory conduct." *Id.* at 1100.

More broadly, the Circuit reiterated that "the articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged," *id.* at 1099 (citations omitted), but that the "critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* at 1100 (quoting *Kendrick*, 220 F.3d at 1227).  Ultimately, then, the Circuit held that the plaintiff in *Plotke*, to satisfy "her *de minimus* prima facie burden," only needed to demonstrate that her

17

termination occurred 'under circumstances which give rise to an inference of discrimination.'" *Id.* at 1101 (quoting *Kendrick*, 220 F.3d at 1227). The Circuit then enumerated a variety of circumstances that can give rise to an inference of discriminatory motive, including "actions or remarks by decisionmakers that could be viewed as reflecting a discriminatory animus . . . or, more generally, upon the timing and sequence of events leading to plaintiff's termination." *Id.* (quoting *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557, 559 (10th Cir. 1996) (plaintiff may attempt to meet his or her burden of showing that discrimination factored into the challenged decision "directly, by showing direct or circumstantial evidence" that discrimination was a factor in the employment decision).[8]

Among the many facts recited earlier in this opinion, Mr. Taylor, the decisionmaker in this case, made several remarks to plaintiff that a jury could reasonably view as reflecting a discriminatory animus or, more specifically, an adherence to sex-based stereotypes based on antiquated notions concerning women in the workplace, including a belief that women were not to be taken seriously in the workplace and that women did not belong in the workplace but should remain in the home to raise children. According to plaintiff, she and Mr. Taylor had a

_____

[8]While not pertinent to the facts presented here, the Tenth Circuit also identified the following circumstances that might give rise to an inference of discrimination: "preferential treatment given to employees outside the protected class; in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees; or a pattern of recommending the plaintiff for position for which she is not qualified (or over-qualified) and failure to surface plaintiff's name for positions for which she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position." *Id.* at 1101 (quoting *Chertkova*, 92 F.3d at 91).

conversation in May 2003 in which he encouraged her to quit her job, suggesting that she would be happier at home raising her children.  Specifically, plaintiff testified that Mr. Taylor stated, "Why don't you just quit?  This isn't a place you'd probably want to be at anyhow.  This is a horrible job, and it's unfair and . . . you probably want to be at home with your son anyhow." According to plaintiff, Mr. Taylor also remarked during this conversation that "Mothers probably want to be at home with their children, you know, you probably don't want to be here, you know, you want to be with your child being a mom."  In addition, when plaintiff raised concerns to Mr. Taylor about what she perceived as objectionable sexual conduct in the workplace, Mr. Taylor ignored the substance of her concerns and, on two occasions, responded only with the statement that "pretty women should smile more."  Taking all inferences from these facts in the light most favorable to plaintiff, the court concludes that plaintiff has made the de minimus showing required for a prima facie case of gender discrimination.

B.      *Plaintiff's Prima Facie Case of Retaliatory Discharge*

To state a prima facie case of retaliation, plaintiff is required to demonstrate that she engaged in protected opposition to discrimination; that a reasonable employee would have found the challenged action materially adverse; and that a causal connection existed between the protected activity and the materially adverse action.  *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315-16 (10th Cir. 2006) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405 (2006))).  Defendant asserts that summary judgment is warranted on

19

plaintiff's retaliatory discharge claim because she did not engage in protected opposition to discrimination and she cannot show a causal connection between any protected opposition and her discharge.  As will be explained, the court rejects these arguments.

In support of its contention that plaintiff did not engage in protected opposition to discrimination, defendant asserts only that plaintiff's complaints of harassment prior to July 3, 2003 were not based on a "reasonable" belief that the acts about which she complained violated Title VII.  *See Crumpacker v. Kansas Dept. of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003) (to engage in protected opposition to discrimination, one must "reasonably" believe that the incident violated Title VII); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (dismissing retaliation claim when "[n]o reasonable person could have believed that the incident [complained of] violated Title VII's standard").  In turn, defendant asserts that plaintiff's beliefs were not "reasonable" because none of the acts about which she complained constituted a violation of Title VII.  This argument ignores the Tenth Circuit's decision in *Jeffries v. Kansas*, in which the Circuit held that "a plaintiff may maintain an action for retaliation . . . regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII." 147 F.3d 1220, 1231 (10th Cir. 1998).  In any event, this court has concluded that the conduct about which plaintiff complained is sufficient to raise a genuine issue of material fact as to whether plaintiff was subjected to unlawful sexual harassment such that a jury must resolve plaintiff's claim.  By definition, then, a reasonable person could have believed that the conduct about which plaintiff complained violated Title VII.

Defendant also contends that plaintiff cannot establish a causal connection between her

20

complaints and her discharge because "it is clear that plaintiff was terminated on July 3, 2003, for failing to work as scheduled on July 1 and 2, and no other reason."  In essence, then, defendant urges the court to consider its proffered nondiscriminatory reason for terminating plaintiff's employment in connection with analyzing plaintiff's prima facie case.  Stated another way, defendant suggests that plaintiff must disprove defendant's proffered reason for its employment decision in order to establish her prima facie case.  As the Tenth Circuit has recognized, such a legal analysis would inappropriately short-circuit the *McDonnell Douglas* framework at the prima facie stage and frustrate plaintiff's ability to establish that defendant's proffered reason is pretextual. *See, e.g., EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1192-94 (10th Cir. 2000) (and cases cited therein).

Thus, the court will not analyze defendant's proffered reason for terminating plaintiff's employment at the prima facie stage and plaintiff need only come forward with evidence "of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Antonio v. The Sygma Network, Inc*., 458 F.3d 1177, 1181 (10th Cir. 2006).  Plaintiff's evidence is sufficient to suggest that she repeatedly raised concerns about objectionable sexual conduct in the workplace throughout the relatively short duration of her employment, including raising concerns as late as June 2003.  In these circumstances, the court concludes that the temporal proximity between plaintiff's complaints and her discharge on July 3, 2003 is close enough that a reasonable jury could infer that a causal connection existed. *See Annett v. Univ. of Kan*., 371 F.3d 1233, 1240 (10th Cir. 2004) (concluding that a period of two to three months between the protected activity and the alleged retaliatory action was sufficient

to establish causation).

C.      *Plaintiff's Showing of Pretext with Respect to her Discharge Claims*

As plaintiff has established a prima facie case for purposes of defendant's motion for summary judgment, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment.  According to defendant, it terminated plaintiff's employment based on plaintiff's insubordination or, more specifically, her refusal to work overtime as scheduled.  Plaintiff concedes that defendant has met its burden of production and, thus, the burden shifts back to plaintiff to demonstrate that defendant's proffered reason is pretext.  *See Antonio v. The Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).  To show that an employer's proffered nondiscriminatory reason for an employment action is pretextual, "a plaintiff must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.* at 1183 (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 490 (10th Cir. 2006)).

Mr. Taylor testified that he told plaintiff that she must report to work as scheduled on July 1 and July 2 and that if she failed to report to work there would be consequences.  Plaintiff, however, testified that when she advised Mr. Taylor that she was unable to work on July 1 or July 2, Mr. Taylor advised her that he would find someone else to cover the shifts and that he would call her at home if he needed her to report to work on July 1 or July 2.  Plaintiff further

22

testified that she stayed home on July 1 waiting for Mr. Taylor to call her and attempting to make child care arrangements in the event that he did call her to report to work. According to plaintiff, she spoke with her son's paternal grandmother to put her on notice that plaintiff may have to report to work and, if so, would need the grandmother to care for plaintiff's child, but she did not secure definitive arrangements due to the uncertainty of whether plaintiff was, in fact, going to have to report to work. Plaintiff testified that she did not report to work because Mr. Taylor never called her to advise her that she needed to report to work.

Defendant contends that plaintiff's testimony fails to create a genuine issue of fact as to whether defendant's proffered reason is unworthy of belief because, at the most, it suggests a "miscommunication" between plaintiff and Mr. Taylor about whether plaintiff was needed to cover the shifts on July 1 and July 2. Relying on Tenth Circuit cases supporting the principle that an employer's "mistaken, but nondiscriminatory reasons" for terminating an employee are insufficient to show pretext, *see, e.g.*, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000), defendant asserts that if Mr. Taylor mistakenly believed that plaintiff knew she was required to report to work on July 1 and July 2, it was logical for him to conclude that her failure to report to work constituted insubordination warranting discharge. In the cases relied upon by defendant, however, the facts were undisputed as to what the decisionmaker actually believed at the time of the decision. In contrast, plaintiff's evidence in this case is sufficient to suggest that Mr. Taylor did not actually believe that plaintiff knew she was required to report to work. If plaintiff's testimony is credited, then a jury could reasonably conclude that Mr. Taylor told plaintiff that she did not need to report to work unless he called her at home and

23

that Mr. Taylor did not honestly believe that plaintiff thought she was supposed to report to work. In other words, this is not a situation in which Mr. Taylor received misinformation from a third party concerning plaintiff or in which it is otherwise undisputed that Mr. Taylor made an erroneous judgment concerning plaintiff or held a mistaken belief about plaintiff. Plaintiff's testimony raises genuine issues of material fact about whether Mr. Taylor honestly believed that plaintiff was insubordinate in failing to report to work or whether Mr. Taylor told plaintiff that she did not need to report to work and then used her failure to report to work as an excuse to terminate her employment based on her gender and/or in retaliation for her complaints of harassment. *See Metzler v. Federal Home Loan Bank of Topeka*, ___ F.3d ___, 2006 WL 2733112, at *11-12 (10th Cir. Sept. 26, 2006) (evidence that decisionmaker did not honestly believe reason articulated for adverse employment action converts articulated reason into pretext) (citing cases). For these reasons, defendant has not shown that it is entitled to summary judgment on plaintiff's discharge claims and a trial is required.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment on all claims (doc. 40) is denied in its entirety.

**IT IS SO ORDERED.**

Dated this 11th  day of October, 2006, at Kansas City, Kansas.

24

s/John W. Lungstrum
John W. Lungstrum
United States District Judge